Statement of the Case.
NICHOLLS, C. J.
In an able brief filed on behalf of the defendant it is forcibly urged:
(1) That the gas company had only the right of user in the public streets along with all other citizens, and acquired no right of “ownership” or “property” in or to any part of the public streets by virtue of its charter provisions. 2 Dillon, Mun. Corp. (3d Ed.) 683.
(2) That it took this right of user subject to the implied condition that the state or the city might, in the exercise of its police power for the public health or the public safety, cause other structures to be placed in or on such street which might temporarily inconvenience the gas company in its use, or which' might occasion the removal to another, part of the street of its mains and pipes, and that any damage resulting from such temporary inconvenience or such removal was damnum absque injuria.
They maintain that the gas company was given the exclusive right to sell gas in the city of New Orleans, and as a necessary incident to enable them to carry on the business of furnishing the public with gas it gave it the right to lay its mains and pipes under and through all the streets and alleys of the city, and implied a right to maintain the same, provided that such work should be done and maintained with as little inconvenience to the public as possible; but it was not given an exclusive right to the use of the streets, nor a property right in or to any particular portion of the street. The Legislature did not designate the particular streets or parts of streets in which the company should lay its mains and pipes, nor vest the common council or any officer of the city with authority to locate the pipes or regulate the location of the same. The whole subject was left to the judgment and at the risk of the gas company, with only a warning that they should be laid in such manner as to least inconvenience the public. Tho gas company took the risk of the location of the pipes. If the gas company could not acquire any property in the public streets, its rights were merely those of user, such a right as any other citizen similarly situated had, or as a street railway had—a right of passage. As a corollary neither the state nor the city lost the right of control or use of streets for other legitimate purposes, and, even if the grant of the gas company was a public use, this did not impair or exhaust the right of the state or the city to make other grants, or to build in such streets other works equally for the public comfort or health. Chicago Railway Co. v. Quincy (Ill.) 27 N. E. 193, 29 Am. St. Rep. 334; Id., 28 N. E. 1070; Kansas v. Morley, 45 Mo. App. 304.
Counsel urge that the enforced removal of the plaintiff’s mains to another part of the street in order to make room for a necessary and important public work was a mere police recognition of its right of user, and was in no sense a “taking” or “damaging” of private property, or a divesting of a vested right which would entitle it to compensation. Assuming the company had a vested right to use some part of the streets did not weaken the position that such vested right could be regulated in a reasonable manner for the public good. It could claim no greater or higher rights than those conferred upon street railway companies by the purchase for a valuable consideration to lay track and operate cars upon the streets. Companies of that kind, having legislative grants to use the streets, can be required by the city in the exercise of its police power for the public safety to erect or maintain gates at 'their own expense at street crossings and to regulate the speed or length of trains imposing heavy outlays and much inconvenience, though neither the state nor the city could divest them of the right to use the streets without making compensation, or make itself liable for damages. The existence of the right of regulation is essential to the welfare of the public, and without it the state or city would be powerless to perform its first duty to its citizens of protecting their health, welfare, and safety. Conditions of life change, and what may seem a reasonable and proper use of the streets, or what may be ample protection for the health and safety of the citizen, in one generation might be utterly unreasonable or inadequate for another. The power to regu *841 late the streets is not only a continuing power, but an inalienable one. This being the case, all privileges such as the plaintiff claims must be understood, to have been granted and accepted subject to the implied condition that the state or city in the exercise of the police power may regulate, limit, or modify that use whenever and wherever the safety, health, or welfare of the public demand it. The state or city might not be permitted to completely deny or destroy the right, or to so unreasonably regulate it as to amount to a denial or destruction, but such was not the situation at bar. Plaintiff had not been deprived of the right to use a single street where its mains had been laid. It had only been required to remove them to one side of the street, so as to permit the construction of sewers. The public health required this, and the public would have been inconvenienced had they not been changed.
The Legislature intended by the provision in the company’s charter .that it should lay its mains and pipes “in such manner as may procure the least inconvenience to the city or its inhabitants” that the right granted should be subordinate to the paramount right ol' the public, and that the company should at all times yield without compensation to the necessities of the public welfare.
Counsel refer the court to Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205, and the authorities therein cited; to National Water Works Co. v. Kansas City (C. C.) 28 Fed. 921; Railroad Co. v. Wakefield, 103 Mass. 261; Jamaica Bond Co. v. Brook-line, 121 Mass. 5; Columbus Gaslight Co. v. Columbus (Ohio Sup.) 33 N. E. 292, 19 L. R. A. 510, 40 Am. St. Rep. 648; Cincinnati v. Penny, 21 Ohio St. 499, 8 Am. Rep. 73; Clapp v. City of Spokane (C. C.) 53 Fed. 516; State v. Flower, 49 La. Ann. 1199, 22 South. 623.
In citing the case of Columbus Gaslight Co. counsel say: “That was a suit for damages for expense of relocating gas pipes to conform to a charter in the established grade of a street made by the city of Columbus. The court held that a gas company laying its pipes in the streets of a city under a grant from the city in conformity with an established grade does so subject to the right of the city to change the grade of the street whenever the necessities of the public require it; and, in the absence of wantonness or negligence on the part of the city, the company cannot maintain any action for damages caused by the necessity of taking up and relaying its pipes in order to accommodate them to the new grade.”
Referring to Jamaica Bond Co. v. Brook-line, 121 Mass. 5, they say: “This was an action of damages to recover expense of changing the location of certain water pipes. Plaintiff alleged that it had theretofore laid water pipes on the streets under its charter in accordance with the established grade in the street; that the city had changed the grade, and required the plaintiff to change the location of the pipes, to plaintiff’s great injury and damage. The court held that the injury was damnum absque injuria.” National Water Works Co. v. Kansas City (C. C.) 28 Fed. 921 (Mr. Justice Brewer), is quoted with the following statement: “This was an action for damages. In 1883 the plaintiff company laid a water pipe in one of the streets of Kansas. The grade of this street had been previously established, and the plaintiff had been directed by -the city to lay a water pipe therein, and the same was laid in the place and manner directed by the city. In 1884 the city dug a sewer on said street on the same part of the street in which the plaintiff’s water pipe had been laid, in consequence of which the plaintiff was compelled to take up and lay its pipe in another place. The action was brought to recover the cost and expense of this relocation.” The ease is even stronger than the case at bar, in that the city had directed the place and manner in which the plaintiff should lay its main, and the water company contended that under the circumstances it had acquired such a vested property right in an undisturbed location and position to entitle it to resist any further trespass or invasion- thereof. The answer of the city was that the matter of sewerage was one affecting the public health; that it could not, if it would, and that it did not, if it could, contract away the right to construct sewers in any part of the public streets; that the plaintiff took its contract to lay its pipes on such public streets subject to the paramount and inalienable right of the city to construct its sewers whenever, in its judgment, the public interest demanded. The learned justice sustained the city’s contention, and said: “Sewerage is a matter un *843 questionably affecting largely the public health, and no municipality can make a contract divesting or abridging its full control over such matters. * * * The contract between the plaintiff and the defendant is to be interpreted in the light of this well-established rule, and, so interpreted, the plaintiff took its right to lay its pipe in the streets of the city subject to the paramount and inalienable right of the city to construct sewers therein whenever and wherever, in its judgment, the public interests demand. Laying its pipes subject to this right of the city, it has no cause of action if, in consequence of this right, it is compelled to relay its pipes.”
Touching the right of the city to have required a change in the location of pipes, even in a case of servitude, defendant calls to our attention Civ. Code, art. 708 (699), under the heading “Of the Right of Passage or Way,” which declares that “when the place for the passage is once fixed, he to whom this servitude has been granted cannot change it, but he who owes this servitude may change it from one place to another in order that it may be less inconvenient to him, provided that it afford the same facility to the proprietor of the servitude.” See, on that subject, Civ. Code, art. 773.
The plaintiff charged that the defendant, acting while engaged in the prosecution of the work of laying a system of drainage through the streets of New Orleans under Act No. 114 of 1896, p. 162, had “encroached and trespassed upon its property” laid in the streets of that city under authority of its charter and franchise from the state of Louisiana. Plaintiff contends that its charter is a contract with the state, and that none of the rights and obligations therein granted or created can be changed, enlarged, or taken away, either under the Constitution of Louisiana or of the United States, except by the power of “eminent domain,” and then for proper compensation;, citing Clarksburg Electric Light Co. v. Clarksburg (W. Va.) 35 S. E. 994, 50 L. R. A. 142; Indianapolis v. Consumers’ Gas Co., 140 Ind. 114, 39 N. E. 433, 27 L. R. A. 514, 49 Am. St. Rep. 183; Chicago Gas Co. v. Lake, 130 Ill. 42, 22 N. E. 616; Louisville Gas Co. v. Citizens’ Gas Co., 115 U. S. 683, 6 Sup. Ct. 265, 29 L. Ed. 510.
It does not claim that there was actual physical invasion—any taking possession or using—by the drainage commission of the mains and pipes. Its argument is that, the Legislature having granted the right to the gaslight company to lay its mains on the streets for the purpose of its business anywhere, when this right has been once exercised it will be presumed the pipes are properly laid, and the right becomes a vested and fixed property right, and that right cannot be disturbed or injured for another public purpose without compensation duly made under an express or implied exercise of the power of eminent domain; citing Sixth Avenue Railway, 72 N. Y. 330.
It contends that the simple fact that the particular public work, in aid of whose prosecution its own main and pipes are asked to be shifted to another part of the street, may be a work in aid of public health or of the public good, relieves the state or city seeking to construct such work from the obligation of making compensation to it for the loss it has been made to sustain in changing its main to accommodate the work; that, while the citizen may be forced on some occasions and under some circumstances to submit to losses and injuries to himself through acts of the government taken for the public welfare, the mere fact that such was the character of the work does not of necessity carry with it that result; that the facts and circumstances of this case do not make it one where no remuneration for damages can be sustained. Plaintiff contends that the police power, properly so called, as forcing parties to submit to losses and injury without a claim for compensation, is a power of “regulation” by the government over the use and enjoyment of property in the interest of the lives, limbs, health, comfort, and quiet of all persons, and the protecting of all property within the state. Thorpe v. Rutland & B. R. Co., 27 Vt. 140, 62 Am. Dec. 625; Cooley’s Constitutional Limitations (3d Ed.) c. 16, p. 572.
Plaintiff contends that the construction of a system of drainage is not a work of “regulation.” It is simply the prosecution of a public work for the public good, and while, therefore, private property of any kind whatever may be taken or damaged, inflicting a particular injury must be compensated, as falling under the protection of article 167 of *845 the Constitution, which declares that “private property shall not he taken or damaged for public purposes without just and adequate compensation being first made.” That the rule announced in the earlier decisions of courts, that acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequence might impair its use, were not a “taking” of property within the constitutional provision, and did not entitle the owner of such property to compensation from the state or its agents, or give him any right of action, were decisions rendered in view of the language of the constitutional restriction in the then existing Constitutions, that private property should not be taken for public use without just compensation being made, and ceased to apply after the language of the Constitution was altered so as to declare that “private property shall not be taken or damaged for public use without just compensation.”
That the former Constitutions prohibited the “taking” of private property, and, under judicial construction, compensation was demanded only where there was an actual taking of private property—its physical invasion—but now, where the Constitution prohibits not only the “taking” of private property but its being “damaged” for public uses, the doctrine has been accepted that a recovery by the owner might be had in all cases where private property had sustained a substantial damage by the making and using an improvement that was public -in its character. That it no longer required the damage to have been caused by a trespass, or an actual physical invasion of the owner’s real estate, or physical injury to the thing damaged, but recovery might be had if the construction and operation of the railroad or other improvement was the cause of the damage, even though the latter was consequential.
Plaintiff, in support of this proposition, quotes the syllabus of Chicago v. Taylor, reported in 125 U. S. 161, 8 Sup. Ct. 820, 31 L. Ed. 638, which declares that, under the provisions of the Constitution of Illinois adopted in 1870, that “private property shall not be taken or damaged for public use without just compensation,” a recovery may be had in all cases where private property has sustained a substantial injury from the making and use of an improvement that is public in its character, whether the damage be direct, as when caused by trespass or physical invasion of the property, or consequential, as in a diminution of its market value.
This case, which is confidently relied upon by plaintiff, originated in the Circuit Court of the United States for the Northern District of Illinois, and resulted in a judgment in favor of the plaintiff. It was taken by writ of error to the Supreme Court of the United States, and the judgment below was affirmed. The decision of the Circuit Court was based upon and followed the decision of the Supreme Court of Illinois in the case of Chicago & Western Indiana Railroad v. Ayres, 106 Ill. 518, which itself was based upon its own prior decision in Rigney v. City of Chicago, 102 Ill. 64. In the case of Chicago v. Taylor, the owner of property fronting on Lumber street, with Eighteenth street as a side street, sought to recover the damages sustained by reason of the construction by the city of Chicago of a viaduct on Eighteenth street in the immediate vicinity of the lot. The construction was directed by special ordinances of the city council under authority conferred by the charter. The lot had been used for years as a coalyard; having sheds, machinery, engines, boilers, etc., upon it, required for the purposes of that business. The effect of the construction of the viaduct was seriously to affect the market value of the lot for the purposes for which it was specially adapted, or for any other purpose for which it was likely to be used, by reason of access to it from Eighteenth street being materially diminished, and at some points practically cut off, with the further result that the use of Lumber street as a way of approach to the coalyard by its occupants and buyers, and as a way of exit for teams carrying coal from the yard to the customers, was greatly impaired. There was evidence tending to show that one of the results of the construction of the viaduct and the approaches on either side to the bridge over Chicago river was that the coal-yard was often flooded with water running onto it from those approaches, whereby the use of the premises as a place for handling and storing coal was greatly interfered with, and often became wholly impracticable. On *847 behalf of the city, there was evidence tending to show that the plaintiff did not sustain any real damage,* and that the inconveniences resulting from the construction and maintenance of the viaduct were common to all other persons in the vicinity, and could not be the basis for an individual claim for damages. There was a verdict and judgment against the city. The particular judgment rendered is not found in the report of the case, but it was evidently for an amount equal to the reduction in the market value of the lot by reason of the construction' of the work.
The • city contended that, if it was liable at all, it was only liable for such damage as was done to the market value of the property by rendering access to it difficult or inconvenient. The court below charged that the real question was, had the value of this property to sell or rent been diminished by the construction of the viaduct? It might be that it could no longer be used for the purposes of a coalyard, or for any other purpose for which it had been theretofore used, but that would not be material, if it could be rented or sold at as good a price for other purposes, except that if the proof satisfied the jury that any of the permanent improvements put on the lot for any particular business which had been before carried on there, and for which it had been improved, had been impaired, and the bridge was raised as before, and the jury could, from the proof, determine how much these improvements were damaged, the plaintiff would be entitled to recover for such damage to the improvements—that is to say, the lot being improved for a specific purpose, if the proof satisfied the jury that it could no longer be rented or used for that purpose, and that thereby these improvements had been lost or impaired in value, then the impairment of value to these improvements was one of the elemehts of damage which the plaintiff was entitled to have considered and passed upon, and included in his damage.
The court below charged that the flooding of the lot by water running down upon it from the approaches to. the viaduct was an element of damage which the jury might consider, though, if such flooding merely caused inconvenience to the occupant in the conduct of his business—such as his coal getting wet, or its becoming more difficult to keep his scales properly adjusted—these were not elements of impairment to the value of the property for purposes of sale; that, although the occupant might have found it difficult to haul coal out of his yard, and although it might have been much more unprofitable to conduct the business of selling coal at this lot, that did not weigh upon the question as to the value of the lot.
Opinion.
The New Orleans Gaslight Company was created by act of April 1, 1835. By the charter it was authorized to lay pipes and conduits at its own expense in any of the public ways or streets of those localities, having due regard to the public convenience.
By amendments its rights were continued to be enjoyed until 1st April, 1895, when its corporate privileges were to expire. By Act No. 97, p. 216, of 1870 (extra session), another company, under the name of the Crescent City Gaslight Company, was incorporated, which was authorized to lay pipes or conduits at the expense of the company in any of the streets or alleys of the city of New Orleans where the same may be required,. in such manner as may produce the least inconvenience to the city or its inhabitants, and provided, also, that the company shall afterwards repair with the least practicable delay the streets they have broken.
The two companies were subsequently consolidated under the provisions of Act No. 158 of 1874 (Laws 1875, p. 18). At the period of the passage of these acts and the creation of the corporations, the constitutional provision that private property shall not be damaged for public purposes without just compensation were not in force. The rights and obligations of the parties were given and accepted under the provisions of the laws and the Constitution as then existing. Hill v. R. Co., 38 La. Ann. 607.
The case is presented by the plaintiff as if the state, the common author of rights and privileges granted to two distinct corporations, had secured and granted to the second corporation rights which trenched upon, modified, and impaired those accorded to the first; but this is not the case. The drainage commission, the defendant in this case, does not occupy the position of a second quasi public *849 corporation. It is simply the state itself acting through it on its own behalf, and in the general public interest. What the state did was not to grant a concession to a third person, but to resume control for itself of that which it had permitted the plaintiff company conditionally and contingently and temporarily to occupy. The state, in requiring the plaintiff company to shift the position of its mains to a different part of the street, so as to permit the construction on public property of a work of undoubted utility for the public health, has simply exercised what it had reserved the right to do, or, rather, simply enforced in its own favor against the plaintiff one of the conditions upon which the right of the use of-the streets had been granted to it—a condition subject to the exercise of which it had accepted the rights and privileges granted to it. A contingency which was contemplated as possible having arisen, the plaintiff has no legal ground of complaint. It is not claimed that the mains or pipes of the plaintiff have been injured by being removed to another part of the street, nor that any part of its work or materials has been or will be utilized by the state or city for its own purposes, nor even that the value of the franchise for purposes of sale or rent, which was the only damage recognized by the Supreme Court in the case of Chicago v. Taylor, has been lessened or impaired. The only matter in contest is the sum of money expended by the plaintiff in making the required change of position of the pipes. The franchise itself remains in full force and effect. If this change had been required to have been made in 1878 (before the Constitution of 1879), we scarcely think that plaintiff would have raised the issue which it does now, or questioned the absolute right of the state to have required it to move its pipes, and to yield without claim to reimbursement to the public needs. The rights of the state were read into the charter of the company, and they fixed the very tenure by which plaintiff acquired its privileges.
The change made in the Constitution of 1879 did not alter the tenure by which plaintiff was to occupy the public streets. Plaintiff’s original obligations in this respect remained as they had been undertaken at the beginning.
The view which we take of the situation of the parties renders unnecessary any general discussion of the subject-matter of the police power of the state, or of the right of eminent domain, and of the right of private individuals or corporations to remuneration for their property taken or damaged for the public use. We think it not amiss to say that we do not think that the plaintiff’s rights can be reasoned out from the standpoint which it would have occupied if the mains and pipes whose position was required to be changed had been laid not on or under the public streets of a city, but on or under property owned by itself in fee simple. The situation of the plaintiff in the two cases would have been materially different. Plaintiff says: “It is simply hair-splitting to argue the question whether or not the gaslight company has a property right on any of the streets of New Orleans. There is no such contention in this case. The contention is that there is a property right in the privilege to lay its mains, and in the mains when so laid, in connection with the public purpose for which the franchises of incorporation and the franchises or right to enter upon the streets for the purpose were granted. It is not contended that by reason of the grant to the plaintiff the state or city lost the right of control or use of the streets for other legitimate purposes. It is contended that the plaintiff has a specific and special right, which it exercises under special and exclusive grant from the sovereign, which, being exercised by the grantee, reduced to possession, and in connection with the piirpose for which it was granted by common consent and judicial and legislative authority, constitutes property protected by constitutional provisions, which may be the subject of mortgage, of lease, or of sale, and is taxed by the governmental authorities as such.”
We cannot recognize that plaintiff had or has any vested right in the premises to occupy any particular part of the public streets. If its right in the premises could be designated as a property right, it was ab initio not a perfect, but an imperfect, right, contingent and conditional in its nature and character, held subject to the paramount right of the state over the right, and controlled by law and regulation of the police authorities. *851 Civ. Code, art. 490. Its right does not rise to the dignity of a servitude established in its favor by a contract. It is, at best, a license subject to modifications as the public necessities or convenience might require. McCormick v. Louisiana & N. W. R. Co., 109 La. 767, 33 South. 762.
We are not called on to decide whether the situation was such as to require absolutely that plaintiff should have altered the position of its mains so as to permit the construction of the drainage canals. That issue is not in this case.
We are of the opinion that the judgment heretofore rendered in the present case is erroneous, and that it should be set aside.
For the reasons herein assigned, it is ordered and decreed that the judgment of this court heretofore rendered in this cause be, and it is hereby, set aside; and it is now ordered, adjudged, and decreed that the judgment of the district court • appealed from herein be, and the same is hereby, affirmed, and plaintiff’s demand is rejected, with costs of both courts. .
See dissenting opinion of BREAUX, J., 35 South. 934.