ON REHEARING
McCALEB, Justice.
The Department of Highways of the State of Louisiana is engaged in the con *597 struction of a limited-access or controlled-access highway through the City of Shreveport. This highway extends through North Louisiana and forms part of Interstate Highway No. 20, one of the various interstate highways being built under the provisions of the Federal Aid Highway Act of 1956 (23 U.S.C. § 101 et seq.). The Department of Highways, pursuant to the authority vested in it by R.S. 48:301-306, has secured the consent of the City of Shreveport to take over the city streets through which the highway is to pass and to erect the control-access facility in accordance with the plans and specifications prepared by the Department which have been approved by the City of Shreveport. In other words, the City, for all intents and purposes, has ceded the city streets, over which the highway is to pass, to the State Department of Highways and, by virtue of R.S. 48:301, the latter has been vested with full control of the project and jurisdiction over these streets as part of the State Highway system specifically set forth'and provided for by R.S. 48:191-193.
At the time the Department of Highways (hereinafter designated as plaintiff) put into execution this construction project, Southwestern Electric Power Company and Shreveport Transit Company, two local utilities which had erected their lines, poles and other facilities on the streets of the City of Shreveport under franchises issued by the City, refused to adjust and remove these facilities from the streets so that the highway could be built unless plaintiff would agree to pay the costs attendant to the adjustment or removal of such property. As a result of the position of the utilities, this suit was brought by plaintiff to require these companies to remove their facilities from the construction project at their own expense.[1]
Plaintiff claims that it is entitled to the relief sought, notwithstanding the franchise rights of the utilities, as the building of a new project on the city streets is a proper exercise of police power to which the contractual rights of occupancy of the public streets by the utilities must yield.
On the other hand, the principal contentions of the utilities are that, whereas plaintiff has the right to require the removal or adjustment of their facilities, it may do so not under police power but only under authority of eminent domain; that their franchises accord them a property right to use the city streets; that these franchise rights may not be destroyed or impaired without payment of just compensation, which compensation is the cost of the adjustment and removal of the facilities; that, furthermore, plaintiff may not exert the *599 police power of the State as it is merely a State agency not vested with police power and that, even if it is held that plaintiff has police power, the attempted use of such power in this case is unreasonable and arbitrary.
These contentions of the utilities were sustained in the district court, the Court of Appeal (see State v. Southwestern Electric Power Company, 127 So.2d 309) and by this Court on first hearing. On reconsideration, we are convinced that the defenses are contrary to the principles established by the settled jurisprudence of this Court and that the decision to be rendered herein is governed by the landmark case of New Orleans Gaslight Company v. Drainage Commission, 111 La. 838, 35 So. 929 (1903), affirmed 197 U.S. 453, 25 S.Ct. 471, 49 L.Ed. 831, as we shall later demonstrate.
Plaintiff’s demand herein stems entirely from the obligation imposed on it by law and the authority specially conferred by ihe Legislature to construct and maintain the highways of this State in the interest of the public welfare and safety. As a necessary and integral concomitant of this authority, plaintiff invokes the police power of the State to require the utilities to remove their equipment from the construction site at their own expense.
The utilities do not deny that the State has such police power but they say that this power has not been delegated to plaintiff by the Legislature and that, since to require them to remove their equipment from the public way involves the impairment of their franchise property right to use the streets of the City of Shreveport, plaintiff can only force such rdmoval under the power of eminent domain and that just compensation must be paid.
It is, of course, rudimentary that private property may not be taken or damaged for public purposes without payment of just compensation. This constitutional guarantee of compensation for the taking and damaging of private property for public purposes is in no way affected by the fact that the expropriator is exerting police power. Hence, if it be true, as the utilities claim, that plaintiff is taking or damaging their property within the meaning of that term, as expressed in Section 2 of Article 1 of our Constitution, the question of whether plaintiff is properly exercising police power would be a matter of no importance as just compensation would nevertheless be due. Therefore, the primary question at the threshold of the case is whether or not the utilities’ franchise right to use the streets of the City of Shreveport for the housing of their equipment is a property right of such a nature that it is not subject to reasonable exercise of the State’s police power by requiring removal or adjustment of their lines and equipment without reimbursement of the costs expended for the forced change of location.
*601 In our view, there has not been a taking or damaging of the contractual rights acquired by the utilities under their franchises with the City of Shreveport in any respect. Indeed, the contractual property right of the utilities to place their equipment on the city streets remains unimpaired. There has been no physical taking or damaging of the fixtures or other property of the utilities. The only demand of the plaintiff in this case is that the fixtures and equipment be removed from the public way in order that the controlled-access highway may be constructed and put in operation for the benefit of the public. True enough, the removal of the utilities’ structures from the right-of-way will entail some expense but, when the case is viewed in its proper perspective, it will be seen that this expense was one which the utilities were required to bear by the obligations of the franchises granting them the use of the city streets.
 The law is well settled, as pointed out in the New Orleans Gaslight Company case, supra, that a utility franchise to use the public streets of the city does not vest in the utility any right to occupy a particular part of the street; the right granted iS “ * * * ab initio not a perfect, but an imperfect, right, contingent and conditional in its nature and character, held subject to the paramount right of the state over the right, and controlled by law and regulation of the police authorities.” This right to use the public streets does not vest the utilities with a servitude or any other sort of a real right in tke streets. Indeed, under Article 458 of the Civil Code, the public streets belong in common to the inhabitants of the city and, therefore, private persons or corporations cannot acquire any proprietary interests therein.[2]
The utilities in this case are not claiming, except inferentially, that their franchise rights are being impaired by requiring them to move their equipment from the public way. If they were making such a claim, and if it could be said that there was .an impairment of the franchise rights for which damages were due, then the measure of the recoverable damages would be the *603 difference between the value of the franchises before and after the equipment was removed. See McMahon v. St. Louis, A. & T. R. Co., 41 La.Ann. 827, 6 So. 640; American Tel. & Tel. Co. of Louisiana v. Maguire, 219 La. 740, 54 So.2d 4; Texas Pipeline Company v. Barbe, 229 La. 191, 85 So.2d 260 and other cases holding that the only damages recoverable within the purview of Section 2 of Article 1 of our Constitution are severance damages, this being the difference between the value of the property before and after the damages were inflicted. Mere consequential damages arising from discomfort, disturbance, injury to business, cost of removing property from the condemned premises and the like are damna absque injuria,. Rapides Parish School Board v. Nassif, 232 La. 218, 94 So. 2d 40 and State through Department of Highways v. Levy, 242 La. 259, 136 So.2d 35.[3]
However, we do not find in this case that the requirement that the utilities remove their equipment from the construction site effects an impairment of the utilities’ contractual rights. For, implicit in the franchises granted by the city to place lines, wires and poles on the streets was the condition that such equipment and facilities would not at any time interfere with any other public use to which the State or the City might see fit to devote the streets in the public interest. In dealing with franchise rights in the use of the public streets, 18 Am.Jur. “Eminent Domain” states the rule in Section 161 thus:
“Such a franchise is, however, granted upon an implied condition that the structures laid by virtue of its authority shall not at any time interefere with any other public use to which the state may see fit to devote the way, and consequently the corporation maintaining such structures is not entitled to compensation when the disturbance or removal of the structures or an alteration of their location is made necessary by a change in the grade of the highway, or the introduction therein of structures of some other character, or the devotion of the way to some other public use.”
See also 23 Am.Jur. “Franchises”, Sec. 24; 25 Am.Jur. “Highways”, Sec. 182 and 52 Am.Jur. “Telegraphs and Telephones”, Sec. 34.
The principle that a franchise to use the public streets for the housing of equipment is not an absolute right but, rather, is conditioned upon the superior right of the State to require removal of such equipment under *605 a reasonable exercise of police power is, as we have indicated above, exactly the rationale upon which our decision in the New Orleans Gaslight Company case is based. And we have referred to that case as the landmark case for the reason that it has been repeatedly cited and quoted from with approval in the jurisprudence of this country since its affirmance by the Supreme Court of the United States in 1904. That case is identical with this one, the Gaslight Company having advanced the same contention as the utilities have raised here.
In that matter, the Gaslight Company, a corporation engaged in the business of selling gas for heating and lighting purposes in the City of New Orleans and having a franchise to lay its pipes in the city streets, instituted suit against the Drainage Commission of New Orleans, a State agency, to recover compensation for the costs involved In adjusting its transmission lines to accommodate the construction of drains by the defendant. The Gas Company contended, just as the utilities contend here, that it had a specific and special right “ * * which it exercises under special and exclusive grant from the sovereign, which, being exercised by the grantee, reduced to possession, and in connection with the purpose for which it was granted by common consent and judicial and legislative authority, constitutes property protected by constitutional provisions, * * The Court rejected this, argument and held the Company did not have any ■ vested right to occupy any particular part of the public streets; that the right was an imperfect right held subject to the paramount right of the State to require the removal of the facilities and structures under the police power and that this right, subject to this implied condition, could not be said to be damaged wh'en the State, acting within the orbit of its police power, required such removal.
Counsel for the utilities say that the Gaslight Company case is inapplicable here for several reasons. First, they argue that the decision in that matter turned on the fact that the franchise was granted to the Gaslight Company long before the adoption of the Louisiana Constitution of 1879, which was the first constitution providing that compensation shall be paid for private property taken or damaged for public purposes, and that the result would have been different if the franchise had been granted after the Constitution had thus provided.
There is no merit in this proposition as the Court did not base its decision on the fact that the franchise -had been granted prior to the adoption of the Constitution of 1879. It merely stated in the opinion that, had it not been for the inclusion of the guarantee of compensation for the taking of property for public purposes in the Constitution of 1879, “ * * *' .we scarcely think that plaintiff would have raised -the issue which it does now, or questioned the absolute right of the state to have required *607 it to move its pipes, and to yield without claim to reimbursement to the public needs.” Then the Court added: “The change made in the Constitution of 1879 did not alter the tenure by which plaintiff was to occupy the public streets. Plaintiff’s original obligations in this respect remained as they had been undertaken at the beginning.” (Italics ours).
The construction placed by the utilities on the observations of the Court in the Gaslight Company case results in an absurd^, for they would have the holding of the Court mean that the constitutional guarantee of compensation for private property taken or-damaged for public purposes, when.-enacted,-would only apply to future acquisitions-of property and would not protect property rights existing prior to the time of -the adoption of the Constitution.
' Further,'1 the utilities’ counsel proclaim that the Gas-light case is not controlling because the plaintiff in this case is not invested rwith - poliqe power, it being professed th;at the State, has not delegated this power to the-B,oa-rd of Highways and the State Department of Highways,
This postulation is untenable. A casual examination need only be made of Sections 19 and 19.1 [4] of Article 6 of our Constitution (which makes it mandatory for the Legislature to provide for the establishment and maintenance of a system of hard-surfaced State highways and bridges and creates a Board of Highways vesting it with general control, management, supervision and direction of the Department of Highways with authority “ * * * to establish, construct, extend, improve, maintain, and regulate the use of the State highways and bridges * * * ”) and Chapter 1 of Title 48 of the Revised Statutes, creating the Department of Highways conformably with the constitutional mandate, to render the conclusion inescapable that, in the establishment of this governmental agency which is given full control over the highway system of the State under the direction of the Board of Highways, the Legislature intended to delegate and did delegate all police power necessary for the fulfillment of the governmental purposes for which it was created.[5]
*609 We do not understand that the Legislature has to expressly employ the words “police power” in order to vest such power in a State administrative agency. If the duties assigned to that agency are such as would necessarily require the use of police power in the execution of its functions, it is but reasonable to conclude that police power has been delegated. See 11 Am.Jur. “Constitutional Law”, Sec. 256 and New York City Tunnel Authority v. Consolidated Edison Co., 295 N.Y. 467, 68 N.E. 2d 445.[6] We have not the slightest doubt that the Legislature, by vesting in the State Department of Highways plenary control of the highway system of this State, intended to clothe that Department with every power which the Legislature was capable of delegating with respect to the purposes for which the Department was created. Indeed, the Legislature spelled out its intent as late as 1955, when it enacted a law providing for three classes of state highways (see Act 40 of 1955, R.S. 48:191-193). In Section 1 of that statute the Legislature, after setting forth that i.t was vitally essential to the general'welfare of his State to build, maintain and operate a safe and efficient integrated system of highways and roads, and that inadequate roads and streets obstruct the free flow of traffic; “result in undue cost of motor vehicle operation; endanger the health and safety of the citizens of the state; depreciate property values, and impede generally economic and social progress * * * ” stated that:
“In designating the highway systems of this state, as hereinafter provided, the Legislature places a high degree of trust in the hands of those officials, whose duties it shall be, within the limits of available funds, to plan, develop, operate, maintain and protect the highway facilities of the state, for present as well as for future use.
“To this end, it is the intent of the Legislature to make the Board of Highways and the State Highway Department, acting through it, custodian of the state highway system and to provide sufficiently broad authority to en- • able the Board to function adequately and efficiently in all areas of appropriate jurisdiction, * * * ”. (Italics ours).
The next contention of counsel for the utilities is that the New Orleans Gaslight case is distinguishable because the police *611 power exerted -by plaintiff in this matter is unreasonable. This argument is based on the premise that the project under construction is a vast undertaking, which encompasses the destruction of the city streets and the building of a freeway with cloverleaves, interchanges and the like, totally unlike the mere change in width and grade of a roadway which would require only that the utilities move their facilities from one portion of the street to another. The inference we draw from the contention is that counsel conceives that the enormity of the project is beyond the scope of the implied condition of the franchises which contemplated no more than normal changes of the streets by the city authorities for the accommodation of traffic.
This objection, like the others above noted, is not well founded. The answer is that the Highway Department is specifically authorized by law to construct this important project and it is only necessary to consider the legislative intent so strongly expressed in Section 1 of Act 40 of 1955, from which we have quoted hereinabove, to make it manifest that the contention of the utilities, which really relates to the degree of the improvement, is without substance. To say that these public improvements, which are being fostered by the State in the interest of public safefy and the general welfare, are unreasonable, is unrealistic. The highway project is an''answer to a growing public need' and the very reason for the implied condition in the franchises is in contemplation of changing public requirements. See City of Shreveport v. Kansas City, S. & G. Ry. Co. 167 La. 771, 120 So. 290, 62 A.L.R. 1512.
Another argument of counsel is that plaintiff is discriminating against the utilities because it agreed to reimburse the City of Shreveport for the removal of water mains and other equipment which the City had placed on the streets.
Suffice it to say that this is not a legal argument. Whatever plaintiff agreed to do with regard to the City of Shreveport is no concern of the defendant utilities and cannot be employed by them as a ground for evading their obligation to remove their facilities from the public way.
Finally, counsel, citing the Federal Highway Act of 1956 (23 U.S.C. Sec. 123), assert that, since Congress recognized therein that relocation of utility facilities was a necessary part of highway construction in the interstate highway system and specifically authorized the use of Federal funds to reimburse states for the Government’s proportion of the amounts paid to the utilities' for costs of relocation of their facilities, it has evidenced its intent that such relocation costs are unprecedented and should not be required to be borne by the utilities. From this predicate, it is argued that it is improper to hold that the costs of removal should not be paid by plaintiff *613 forasmuch as the law of Louisiana does not prohibit reimbursement and since a proportionate part (90% in this instance) of all monies plaintiff would be required to pay could be recovered from the Federal Government.
We find no substance in this contention. Liability of plaintiff for the costs of removal of the utilities’ facilities from the public way is not to be determined on its right under the Federal statute to obtain reimbursement of a large proportion of the costs from the United States. On the contrary, such liability is to be resolved by the laws of this State. The fact that our law may not prohibit reimbursement of the utilities has nothing to do with the plaintiffs’ liability for reimbursement. We hold that no such liability legally exists.
For the reasons assigned, the judgment of the district court, which was affirmed by the Court of Appeal, is reversed and it is now ordered that there be judgment herein in favor of the Department of Highways of the State of Louisiana declaring that the costs of removal, adjustment and relocation of the public utility lines and equipment owned by the defendant, Southwestern Electric Power Company, and the lines and equipment of the intervenor, Shreveport Transit Company, Inc. in the former streets of the City of Shreveport, be borne by the owners thereof and that the State of Louisiana, through the Department of Highways, is not liable for any expenses attendant thereto. All costs of these proceedings are to be paid by defendant and intervenor.
HAMITER, J., dissents, being of the opinion that our original decree was correct and should be reinstated.
SUMMERS, J., dissents and assigns reasons.
HAMITER and SUMMERS, JJ., dissent from refusal of a second rehearing.

. Originally, Southwestern Electric Power Company was the only defendant; later, Shreveport Transit Company, Inc. intervened in tlie case on the side of the defendant.

. The rationale of the cases from Arkansas and New York, which have held that franchise holders are entitled to recover, under circumstances similar to those presented here, the cost of removing-their property and equipment from the public way, even though there is no special statutory authority requiring such reimbursement (see Arkansas State Highway Commission v. Arkansas P. & L. Co., 231 Ark. 307, 330 S.W.2d 77 (1959) and similar case bearing same ti-tie which was decided on June 4, 1962, and In re Gillen Place, Borough of Brooklyn, etc., 304 N.Y. 215, 106 N.E.2d 897), is that the utility franchises invested them with easements on the public streets. These pronouncements are of no persuasive effect in Louisiana in view of our codal law of servitudes which, as pointed out above, does not permit the establishment of a servitude on public property in favor of private interests.

. Here, the utilities do not claim that the value of their franchise rights have been impaired because they have been required to adjust and remove their facilities: they seek merely consequential damages for the costs of removal which are not recoverable under the authorities above; cited.

. The Secretary of State, in printing the ' Constitution under the authority of Act 380 of 1954, has designated Section 19.1 above referred to (which was adopted on November 4, 1952) as Section 19.2 to distinguish it from -the previous Section 19.1 which was adopted in 1948. The numbering of the second Amendment as Section 19.1 was obviously a clerical error. See State, through Department of Highways v. Bradford, 242 La. 1095, 141 So.2d 378 decided, on rehearing, April 30, 1962.

. Specifically, R.S. 48:21 provides, inter alia, that the function of the Department shall be to administer, construct, improve, maintain, repair and regulate the use of the State Highway system. R.S. 48:26, under the caption “Incidental Powers”, declares that “ * * * the department may perform every act necessary, convenient, or incidental to the exercise of *609 its power and authority, the discharge of its duties, or the performance of its functions.”

. In the cited case, the New York Court of Appeals stated, on page 449 of 68 N.E. 2d: “The enabling act, it is true, does not contain any delegation of police power in 'haec verba, but such language is at best rare; it is not contained in any of the statutes * * * to which our attention has been called. The legislation does, however, contain the language—to which we have already referred—clothing this authority with the attributes of delegated sovereignty as a State agency.”