145 So.2d 312 (1962)
243 La. 564
DEPARTMENT OF HIGHWAYS of the State of Louisiana
v.
SOUTHWESTERN ELECTRIC POWER COMPANY.
No. 45599.
Supreme Court of Louisiana.
January 15, 1962.
On Rehearing June 29, 1962.
Second Rehearing Denied October 3, 1962.
Dissenting Opinion October 16, 1962.
*313 D. Ross Banister, Philip K. Jones, George W. Lester, Thomas A. Warner, Jr., William J. Doran, Jr., Baton Rouge, for relator.
Provosty, McSween, Sadler & Scott, Alexandria, Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, Monroe & Lemann, Chaffe, McCall, Phillips, Burke, Toler & Hopkins, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, Tucker, Bronson & Martin, Shreveport, Plauche & Stockwell, Lake Charles, for amici curiae.
C. Huffman Lewis, Arthur R. Carmody, Jr., Wilkinson, Lewis, Madison & Woods, Shreveport, for defendant-respondent.
John R. Pleasant, Harry V. Booth, Booth, Lockard, Jack, Pleasant & LeSage, Shreveport, for intervenor-respondent.
SUMMERS, Justice.
The Trial Court and Court of Appeal rendered judgment adverse to the claims of the Department of Highways in this suit for a declaration of rights relating to its exercise of the police power. The matter is before this Court on writs granted to review the judgment of the Court of Appeal, Second Circuit.
The Department of Highways is constructing a limited access Federal-aid highway under the authority of LSA-R.S. 48:301-306 in cooperation with the United States Government. The highway in question, a new road, will traverse the northern part of Louisiana, through the City of Shreveport, and has been designated as Interstate 20. In crossing the City of Shreveport the new highway will occupy the space formerly occupied by a number of city streets and alleys.
The defendant, Southwestern Electric Power Company, has a franchise granted to it by the City for the erection of poles and lines and other equipment in the public streets, alleys and parks for transmission, and delivery of its electrical power to its customers.
The Department of Highways, purporting to exercise the police power of the State, has called upon Southwestern to remove and/or relocate at its own expense its poles, lines and other equipment where the highway will cross and replace existing streets and alleys. Upon its refusal the Department sought an injunction to prevent interference with its project and an order to compel removal of Southwestern's facilities from the right-of-way of the highway. The defendant, Shreveport Transit Company, Inc., intervened in that proceeding. The transit company is a public utility corporation engaged in the operation of a system of trolley and gasoline busses for the *314 transportation of passengers over regularly scheduled routes in the City, pursuant to a franchise from the City. The highway project will require the relocation and adjustment of a large number of overhead trolley lines, feeder lines and other facilities used in the operation of its franchise.
The City of Shreveport has refused to require the utility companies to accommodate the highway construction taking the position that the matter is one to be resolved between the Department and the utilities, feeling, too, it is inferred, that it cannot impair the obligations created in the utility franchises. The utility companies have established that the removal required by the Department's project will involve substantial costs. They contend that the action of the Department constitutes expropriation a taking of their property without their consent for which compensation is due.
By agreement between the Department and the utilities the work is progressing and the issue is simply whether the privately owned utility companies can be compelled to remove their facilities without being compensated for the substantial costs involved.
Under authority of Acts of Congress, ninety per cent of the cost of relocating these facilities would be borne by the Federal Government unless this payment violates state law or a contract between the parties.[1] There is no claim of any legal contract between the utilities and the State which would be violated by such reimbursement; nor has reference been made to any law of Louisiana which would be violated by the State reimbursing these utilities, unless we infer from the position taken by the Department of Highways that, inasmuch as that agency is empowered to compel compliance with its demands without reimbursing the utilities for the expense involved in the relocation and removal of its facilities, to nevertheless reimburse them would violate the law of the State. If the position of the Department is untenable, that agency can nevertheless proceed by way of expropriation under laws of this State granting that authority, and under which authority compensation by the Department to the utilities is expressly required.[2] Reimbursement to the State would then be clearly authorized by the congressional authority embodied in Section 123, supra. (Footnote 1)
The determination of the questions at issue is not dependent upon those aspects of this case which have to do with reimbursement between the State and Federal Government, nor is that factor an influence upon the judgment in this cause for these questions must be resolved under applicable state law. It is mentioned, however, because the decision here will necessarily bear upon reimbursement once the legal questions presented by this litigation are settled with finality by this Court. Likewise, it is not determinative of the issues here that the Department has voluntarily agreed to reimburse the City for the costs involved in the removal of city facilities similarly situated, however difficult it may be to find a valid reason for the difference in attitude of the Department toward utilities operated by a *315 city for profit and those operated by private utility companies.
Whether the utility companies are entitled to compensation from the Department requires the determination of these questions under laws of our State: (1) Do the franchises granted the utilities by the City of Shreveport constitute "property"? (2) If so, can the Highway Department take this property from the utilities by administrative order, without paying compensation therefor, by exercising the inherent police power of the State?
The ordinance authorizing the franchise which Southwestern now holds constituted a grant of "the right to lay pipes and erect poles through any of the streets, alleys, avenues, and sidewalks of the City of Shreveport, for the purpose of distributing * * * electricity of said company and for said purpose to maintain posts, conductors, lamps and burners". The ordinance creating the franchise of Shreveport Transit Company, Inc. Likewise was a grant "for the purpose, of maintaining and operating trackless trolley coaches and motor busses, with all necessary and incidental appurtenances, on certain streets and public places" within the City.
These franchises are privileges bestowed by the City on the respective utilities for a consideration and the exercise of these privileges necessarily involved the use of the property of the City in the manner designated by the authority creating those privileges. The privileges, uncommon rights thus bestowed, together with the right to the use of city property which is indispensable to those privileges, constitute a valuable property right of the utilities[3] which under fundamental guarantees cannot be taken or damaged except for public purposes and after just and adequate compensation is paid. This right once created and accepted cannot be altered, hindered or otherwise impaired without the consent of the utilities.[4]
The Department's right to take the property of the utilities by way of expropriation being unquestioned, their right to resort to the police power and thereby avoid the consequences of proceeding by way of expropriation, which involves the payment of compensation, is the only remaining issue.
Police power, like the power of eminent domain, is an element of sovereignty. Though lacking a precise definition, it has been referred to in this State as follows:
"* * * [it] may be said to be the right of a State, or of State functionary, to prescribe regulations for the good order, peace, protection, comfort and convenience of the community, which do not encroach on the like power vested in Congress by the Federal Constitution. Of that power, it may well be said, that it is known when and where it begins; but not when and where it terminates. It is a power, in the exercise of which a man's property may be taken from him, where his liberty may be shackled, and his person exposed to destruction, in cases of great public emergencies." New Orleans Gas-Light Co. v. Hart, 40 La.Ann. 474, 4 So. 215. See also Fernandez v. Alford, 203 La. 111, 13 So.2d 483.
The police power, unlike the power of eminent domain, is used to regulate; the *316 power of eminent domain being used to acquire property from private ownership.[5]
The rule concerning the taking of private property for public use has been stated thus:
"* * * it is universally conceded that when land or other property is actually taken from the owner and put to use by the public authorities, the constitutional obligation to make just compensation arises, however much the use to which the property is put may enhance the public health, morals or safety. No one would seriously contend that private land or buildings or other property might be taken for a hospital, or for a prison, or for the abolition of a dangerous grade crossing without as complete a liability for compensation arising as if the land were to be used for a street or for a city hall.
"Not only is an actual physical appropriation, under an attempted exercise of the police power, in practical effect an exercise of the power of eminent domain, but if regulative legislation is so unreasonable or arbitrary as virtually to deprive a person of the complete use and enjoyment of his property, it comes within the purview of the law of eminent domain. Such legislation is an invalid exercise of the police power since it is clearly unreasonable and arbitrary. It is invalid as an exercise of the power of eminent domain since no provision is made for compensation." (Italics ours) 1 Nichols, Eminent domain, Sec. 1.42(1) (3rd ed. 1950). See, also, 29 C.J.S. Eminent Domain § 6.
In summary, we find that the exercise of the power of eminent domain contemplates that property, servitudes and rights in property are taken from the owner or damaged by divesting him of one of the essential elements of ownership in order that that element of ownership may be transferred to the public for its use, enjoyment and benefit. The exercise of the police power, on the other hand, contemplates that the owner is regulated in the unrestricted use of his property, or his property is destroyed or taken because the owner's use or enjoyment is of such a character that the public welfare is thereby injured.
When the Department contends that it possesses the right to exercise the police power it seeks to invoke under the facts of this case, it does not recognize that the repository of the police power of the sovereign state is its Legislature, and that body may confer that power as it deems proper subject to the limitation that the exercise of that power be within reasonable bounds. La.Const. Art. XIX, Sec. 18; Board of Public Utilities In and For City of New Orleans v. New Orleans Railway & Light Co., 145 La. 308, 82 So. 280. It follows that if the power is not delegated it is withheld.
It cannot be said that the Legislature has vested the police power in every agency, commission and subdivision which it has created. The mere fact that an agency, commission or subdivision of the State exists by reason of legislative authority does not result in the conclusion that the Legislature has seen fit to vest police power in that body. Rather, resort should be had to the language of the legislation which creates and empowers the agency, commission or subdivision to determine just what powers are vested in those bodies.
The Department designates constitutional and legislative enactments which it contends confer upon it the authority to exercise the police power under the facts of this case. It points first to the Constitution of Louisiana, Article VI, Sec. 19 and 19.1 as establishing some of its general powers and responsibilities. Section 19 provides that the Legislature shall authorize the "acquisition by expropriation or otherwise, of *317 rights of way for highways and drains therefor; may provide for the purchase or expropriation of property" needed for the purpose of building highways. Section 19.1 provides for the taking of property for highway purposes by ex parte order upon payment of compensation. Another Section 19.1[*] provides the organization of the Board of Highways. Nothing in these constitutional provisions would permit the inference to be drawn that the exercise of the police power is authorized for the taking or damaging of private property to be converted to the public use as a highway. By authorizing the Legislature to permit the taking of property for highway purposes by "expropriation or otherwise" (otherwise being understood to mean conventional acquisitions, such as, purchase, donation, exchange, lease, etc.) it should be readily understood that those are the only means available and it should not be implied that other means for the acquisition of property are authorized, especially the exercise of the police power.
Among other, the legislation upon which the Department relies to invoke the police power to acquire or damage the property rights involved in this case is LSA-R.S. 32:2 (A), which it contends specifically empowers the Department to "investigate the public highways and effect methods and practices relative thereto, as in its judgment and experience it deems advisable, and enforce them as an exercise of the police power." In quoting the foregoing relative to police power, there is omitted from that quotation the remaining language of that section which unmistakably clarifies its meaning. Fully quoted the section reads: "The department shall supervise and regulate all traffic on the public highways of this state; enforce the provisions of this Chapter; promulgate rules and regulations not inconsistent with this Chapter and the general law relative to public highways and their construction, maintenance and use; investigate the public highways and effect methods and practices relative thereto, as in its judgment and experience it deems advisable; and enforce them as an exercise of the police power of the state." (Italics ours). "Enforce them as an exercise of the police power" refers to methods and practices dealing with traffic regulations nothing else. The very chapter to which reference is made in the quoted section is denominated "Traffic Regulations". To rely upon this authority to invoke the police power of the State for an entirely different purposethe taking or damaging of private property for a highway right-of-way is to seek by way of judicial decree that which can only be bestowed by constitutional or legislative authority. To the contrary, the careful limitation of the use of the police power in the quoted section denies the contention that that power has been bestowed for other purposes. And it is well to observe, too, that the police power there conferred is consonant with the proper concept of its exercise which is to "regulate", for by that authority it may be invoked to "regulate" traffic. Nothing is said in that legislation of the use of police power to acquire property.
Other legislation relied upon by the Department is found in Sections 26, 21, 193(A), (B), 347(A), (C), 381(A), (B) of Title 48 of the Revised Statutes. Nowhere do we find therein authorization to the Department either expressed or implied which would enable that agency of the State to invoke the police power of the State for the purposes of this case which is to damage or to destroy valuable property rights to serve the public use and benefit, and not to regulate private property because the manner of its use is inimicable to public welfare. Rather, a contrary manifestation of legislative intent is apparent, for we find the Legislature has specifically denominated the manner of acquiring property by the Department in LSA-R.S. 48:217 to be "by expropriation, by donation, by purchase, by exchange, or by lease" and, with specific reference to controlled access facilities such as are here involved, the Department's authority *318 is defined in LSA-R.S. 48:303 as follows:
"* * * the highway authorities may acquire private or public property and property rights for controlled access facilities * * * by donation, purchase, exchange, lease, or expropriation in the same manner as they are now or hereafter may be authorized by law to acquire property or property rights * * *."
and in LSA-R.S. 48:442 it is to be noted that provision is made for the ex parte expropriation of property but clearly requiring the payment of compensation. These specified methods and this enumerated authority belies the contention that any other method or authority is to be implied.
The conclusion is evident that if the Legislature had intended that the Department should have the authority to appropriate property by the exercise of the police power that authority would undoubtedly have been spelled out along with those methods it did in fact authorize.
One other matter merits consideration here and it involves the Department's firm reliance upon the case of New Orleans Gaslight Company v. Drainage Commission, 111 La. 838, 35 So. 929, approved by the Supreme Court of the United States, 197 U.S. 453, 25 S.Ct. 471, 49 L.Ed. 831. The basis for the decision in that case is different from that involved here. The New Orleans Gaslight Company was created by legislative act in 1835 and consolidated with City Gaslight Company by legislative act in 1875. As stated by the Court in that case:
"At the period of the passage of these acts and the creation of the corporations, the constitutional provision that private property shall not be damaged for public purposes without just compensation were not in force. The rights and obligations of the parties were given and accepted under the provisions of the laws and constitution as then existing."
This observation by the Court in the Gaslight Company case involves a decision based upon contracts where the rights and responsibilities of the parties situated similar to the utilities in the case at bar had been confected with the knowledge that the Constitution of our State did not provide that private property shall not be damaged for public purposes without just and adequate compensation. The State's fundamental law is now different and a different basic concept controls decrees relating to the taking or damaging of private property. This concept is expressed in the constitutional mandate embodied in Article I, Section 2 that "* * * private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid." Another distinction between the Gaslight Company case and the case at bar is that in the Gaslight Company case an agency of the State was not requiring the removal as in the case at bar, but there the State itself was involved in the exercise of a right it had reserved the right to exercise in the charter to the Gaslight Company. It is significant that in the Gaslight Company case the utility remained in the street and was required only to adjust its lines to accommodate another utility. In the present case the utility is required to completely remove and relocate its facilities away from the streets in which they were formerly installed.
Even though the Department were permitted by the Acts of the Legislature to exercise the police power for the purposes involved in this case, we nevertheless feel that such an exercise of that power under these circumstances would be unreasonable for reasons akin to those assigned by the Court in In re Gillen Place, Borough of Brooklyn, etc., 304 N.Y. 215, 106 N.E.2d 897, which are expressed as follows:
"The rules as to location, referred to in such cases as New York City Tunnel Authority v. Consolidated Edison Co. of New York, supra, [295 N.Y. 467, 68 N.E.2d 445] has been applied in the *319 past only to situations when there was truly regulation, rather than a taking by condemnation. In each such case the utility was required to relocate, but its rights in the particular street remained in being, the relocation therein being merely to accommodate some street improvement. When a street is closed, however, all rights therein are extinguished; `when regulation becomes destruction, it ceases to be regulation'. Eighth Ave. Coach Corp. v. City of New York, supra, 286 N.Y. [84] at page 94, 35 N.E.2d [907] at page 912." See, also, Schwegmann Bros. v. Louisiana Board of Alcoholic Beverage Control, 216 La. 148, 43 So.2d 248, 14 A.L.R.2d 680, which recognizes the rule that the exercise of the police power must be reasonable.
The identical situation applies in the case at bar. The Department of Highways is destroyingnot regulatingthe poles and wires of the utilities. For example, how can an electrical company relocate a line running along a city street when the street is destroyed and replaced by a complicated cloverleaf interchange pattern? The practical effect of this is that the utility has to tear down, at its own expense, the lines built along the city street and rebuild them elsewhere, at its own expense, in a place, manner and design satisfactory to the Department. For all practical purposes this constitutes a destruction or damaging of the utility's property; for in order to be relocated and redesigned the facilities must in fact be destroyed and rebuilt and thereby as relocated assume a character wholly foreign to that which they possessed prior to the removal.
We hold, therefore, that the utilities are entitled to compensation for the removal costs involved in this case under the expropriation law of the State. Judgment affirmed.
McCALEB and HAMLIN, JJ., dissent with written reasons.
McCALEB, Justice (dissenting).
The fundamental error in the majority opinion consists in the assumption that the Department of Highways is taking and damaging the property rights of the public utility companies for which just compensation must be paid. The property rights which plaintiff is allegedly damaging are said to be the utilities' franchise right to place and maintain their equipment on the streets of the City of Shreveport in connection with their businesses.
There can be no doubt that a franchise right of this sort is a property right which may be enforced, within certain limitations (see New Orleans Gaslight Co. v. Drainage Commission, 111 La. 838, 35 So. 929 and City of Shreveport v. Kansas City S. & G. Ry. Co., 167 La. 771, 120 So. 290, 62 A.L.R. 1512), by the grantee against the grantor. But it is a misconception of fact to say that plaintiff, in constructing the new highway over the streets of the City of Shreveport and in requiring the utilities to remove their property therefrom, is either taking or damaging the utilities' property rights within the meaning and intendment of our constitutional guarantee that private property shall not be taken or damaged for public purposes without prior payment of just compensation. As a matter of fact, the contractual property right to house their equipment on city streets remains unimpaired. And this is so, notwithstanding that the City of Shreveport has discontinued the use of certain city streets as such, having consented that these streets be converted to controlled access highway purposes by the Department of Highways and that, as a direct result of the change, the utilities have become obliged to remove their property from the highway construction site.
The franchise right of the utilities to place and maintain their equipment on these particular streets of the city, could continue only for so long as the streets were in esse and during the time their grantor (the City of Shreveport) had the streets under its jurisdiction and control. When *320 plaintiff, acting conformably with law (see R.S. 48:301 and R.S. 48:304), obtained the consent of the City of Shreveport to destroy these streets and use the space they occupied, together with other land, to construct a controlled-access highway, it (plaintiff) became vested with full power and control of the project just as though it had acquired title to the streets by expropriation or voluntary purchase. In these circumstances, the utilities are totally without any legal right to encumber the construction project and, as they have long since conceded, their franchise rights to maintain their equipment on the condemned streets has ended.[1]
Nevertheless, the utilities have contended, and successfully so, that the forced removal of their property from the right-of-way constituted a damaging of their franchise rights for which restitution is required by Section 2 of Article 1 of the Constitution of 1921. And they say that the measure of their compensation is the cost of removing their equipment from the highway project.
I find no merit in this postulation. It is to be borne in mind that the utilities do not hold a servitude or any other real right (jus in re) or even a lease (jus ad rem) on or in the streets of the City of Shreveport on which their property is located. But let me suppose that they did have some sort of a real right in the streets of the city which plaintiff has taken (if this were legally possible). Under such circumstances, what would be the measure of compensation due the utilities upon the expropriation of the imagined real right? They would be entitled, of course, to be paid for the market value of their real right and for such consequential or severance damages they would sustain by the taking.
But of what elements are these consequential or severance damages composed, under our law? Do those damages include the cost of removing personal property of the owner from the expropriated land?
The answer to these questions is found in a legion of cases which have discussed and clearly set forth the nature and elements of the severance damages included within the purview of Section 2 of Article 1 of our Constitution, to which an owner is entitled in expropriation cases. In Texas Pipe Line Company v. Barbe, 229 La. 191, 85 So.2d 260, the Court on second rehearing, in applying the uniform rule, quoted approvingly from American Tel. & Tel. Co. of Louisiana v. Maguire, 219 La. 740, 743, 54 So.2d 4, 5, Note 2, as follows:
"`It is the well-settled jurisprudence that the damages allowable under Section 2 of Article 1 of the Constitution of 1921, resulting from expropriation of property rights are the difference between the market value of the property for sale or rental purposes, immediately before and immediately after the expropriation. Mere consequential injuries to the owners arising from discomfort, disturbance, injury to business and the like are damnum absque injuria. See Harrison v. Louisiana Highway Commission, 191 La. 839, 186 So. 354 and cases there cited.'"
So it is seen that, even if it be assumed that plaintiff has taken or damaged some nebulous property right of the utilities, they would not be entitled to reimbursement under our law for the costs expended by them *321 in removing their property from the highway.
In the recent case of Rapides Parish School Board v. Nassif, 232 La. 218, 94 So. 2d 40, where the owner of a grocery store, whose property was expropriated for school purposes was insisting (like the utilities here) that she be allowed damages totalling $753.25, representing the cost of moving the store and equipment to another location, the Court, in rejecting recovery for these items on the ground that they were damnum absque injuria, quoted at length from McMahon v. St. Louis A. & T. R. Co., 41 La. Ann. 827, 6 So. 640 (1889). The McMahon case involved the effect to be given to Article 156 of the Constitution of 1879 which had changed the previous constitutions with respect to the payment for property taken for public purposes by adding thereto that compensation should also be paid for property damaged as a result of expropriation. The precise inquiry of the Court was directed to the nature of the damages allowable under the constitutional provision and it was concluded that, conformably with the views of the Supreme Court of the United States in City of Chicago v. Taylor, 125 U.S. 161, 8 S.Ct. 820, 31 L.Ed. 638, recovery was to be extended only to severance damages measured by the difference in value of the damaged property immediately before and immediately after the infliction of the damages. The Court said:
"The article 156 of the present (1879) Constitution (which is substantially the same as Section 2 of Article 1 of the Constitution of 1921), in providing that `private property shall not be taken or damaged for public purposes without adequate compensation,' etc., only extended its protecting shield over one additional injury and required compensation, not only for property taken, but also for property damaged.
"As in the case of a taking the measure of compensation is the value of the property taken, so in the case of damage the measure of compensation is the diminution in value of the property.

"There is no warrant for extending the liability one whit beyond this. We are simply to inquire what damage has been done to the property, i. e., to its value for rental and sale. Mere consequential damages to the owners arising from discomfort, disturbance, injury to business and the like, remain, as they were before, damna absque injuria, particular sacrifices which society has the right to inflict for the public good." (Words in parenthesis and emphasis supplied).
Thus, it is manifest from the foregoing that the utility companies in this case are not entitled to recover the costs of removing their equipment from the highway on the theory that their property rights have been damaged by plaintiff and that these property rights come within the protection given by Section 2 of Article 1 of the Constitution.
In the view I take of the casethat there has been no expropriation of property rights of the utilities for which compensation must be paidit is not of importance to determine whether the Department of Highways has or has not been vested with police power.[2] Surely, plaintiff, having *322 acquired the right-of-way and use of the city streets on which the utilities' wires, poles and other property are situated, has the right to require the utilities to remove these obstructions to the construction work, irrespective of whether it has police power or not.
The contention that plaintiff has not been delegated police power by the Legislature has been cleverly injected into the proceeding by counsel for the utilities in an endeavor to evade the effect of the decisions in the New Orleans Gaslight case, 111 La. 838, 35 So. 929 and City of Shreveport v. Kansas City S. & G. Ry. Co., 167 La. 771, 120 So. 290, 62 A.L.R. 1512. Those cases are authority for the doctrine that, albeit a franchise given by a state or municipality to a private utility corporation to lay its pipes, rails, wires and other structures in and on a public highway is a property right which cannot be arbitrarily rescided, nevertheless the grantor may at any time require the removal or alteration of such structures by the grantee where, in the proper exercise of its police power, the public safety or general welfare makes it reasonably essential to effect the change. The reason for this rule is succinctly stated in 18 Am.Jur. Sec. 161 under the title "Eminent Domain", thus:
"Such a franchise is, however, granted upon an implied condition that the structures laid by virtue of its authority shall not at any time interfere with any other public use to which the state may see fit to devote the way, and consequently the corporation maintaining such structures is not entitled to compensation when the disturbance or removal of the structures or an alteration of their location is made necessary by a change in the grade of the highway, or for the introduction therein of structures of some other character, or of the devotion of the way to some other public use." (Emphasis mine).
Some of the cases cited in support of the text of American Jurisprudence, including the New Orleans Gaslight Company case, have been approved by the Supreme Court of the United States. These cases are applicable to the situation where the grantor of the contractual right is seeking to effect the change under a police regulation. In the case at bar, the position of the Department of Highways is much stronger because it has neither incurred a contractual obligation in favor of the utilities nor has it assumed the obligation of the City.
In sum, I find it most difficult to perceive the semblance of any legal theory whatsoever under which the utilities in this case conceive that the money of the taxpayers should be used to reimburse them for the expense attendant to moving their property from the public way.
I therefore respectfully dissent.
HAMLIN, Justice (dissenting).
I feel compelled to dissent from the majority opinion rendered herein and to assign my reasons for so doing.
I have the utmost respect for the views expressed in the majority opinion, and it is evident from a reading of same that it was *323 rendered after giving much consideration to the problems presented.
However, I feel that in being so diligent in its efforts to give consideration to the issues herein, this court and the courts below have overlooked the fact that a "taking" is not involved in this case.
It is my view that the rationale of the case of New Orleans Gaslight Company v. Drainage Commission, 111 La. 838, 35 So. 929, approved by the Supreme Court of the United States, 197 U.S. 453, 25 S.Ct. 471, 49 L.Ed. 831, is applicable to the instant case. In that case a relocation of pipes was involved.
In the instant case the plaintiff is endeavoring to compel the defendant to adjust its lines in the streets of the City of Shreveport to make room for the necessary construction and a permanent highway.
The Gaslight Company case was decided by the Supreme Court of Louisiana in 1903, when paved roads were virtually non-existent. We have seen from the stream of history that paved roads are the product of the growth of our State and Nation. Today paved roads, in my opinion, are necessary to the health, welfare, safety, comfort and convenience of the citizens. The needs of highway traffic entering, passing through, and leaving a city, are rapidly growing. It is my further view that the utility company, which has had the use of the public right of way for its private benefit, should pay for changes in its own facilities. The State has no need for the presence of the transmission line in the right of way; the utility company, which located it at the risk that it might be, at some future time, disturbed, when the State might require, for a necessary public use, that changes in location be made, should pay the costs as it takes the profits.
It cannot be gainsaid that adding costs of all utility line adjustments in this State to the other costs of a magnificent highway program might cause a slowdown in the program because of lack of sufficient funds; or it might lead to increases in gasoline taxes. A slowdown would have a very bad effect upon the health, welfare, safety, comfort and convenience of our citizens, prolonging and increasing exposure to crowded streets, inadequate facilities, and insufficient traffic control.
We have quite a few substantially large communities in this State. I will name but a few: New Orleans, Baton Rouge, Monroe, Shreveport, Alexandria, Lake Charles, Lafayette. Reason bids me to conclude that if utility companies in those cities alone could make the State pay for changes in the location of facilities, the costs which the State would have to bear would be extremely large.
I respectfully dissent.

ON REHEARING
McCALEB, Justice.
The Department of Highways of the State of Louisiana is engaged in the construction of a limited-access or controlled-access highway through the City of Shreveport. This highway extends through North Louisiana and forms part of Interstate Highway No. 20, one of the various interstate highways being built under the provisions of the Federal Aid Highway Act of 1956 (23 U.S.C. § 101 et seq.). The Department of Highways, pursuant to the authority vested in it by R.S. 48:301-306, has secured the consent of the City of Shreveport to take over the city streets through which the highway is to pass and to erect the control-access facility in accordance with the plans and specifications prepared by the Department which have been approved by the City of Shreveport. In other words, the City, for all intents and purposes, has ceded the city streets, over which the highway is to pass, to the State Department of Highways and, by virtue of R.S. 48:301, the latter has been vested with full control of the project and jurisdiction over these streets as part of the State Highway *324 system specifically set forth and provided for by R.S. 48:191-193.
At the time the Department of Highways (hereinafter designated as plaintiff) put into execution this construction project, Southwestern Electric Power Company and Shreveport Transit Company, two local utilities which had erected their lines, poles and other facilities on the streets of the City of Shreveport under franchises issued by the City, refused to adjust and remove these facilities from the streets so that the highway could be built unless plaintiff would agree to pay the costs attendant to the adjustment or removal of such property. As a result of the position of the utilities, this suit was brought by plaintiff to require these companies to remove their facilities from the construction project at their own expense.[1]
Plaintiff claims that it is entitled to the relief sought, notwithstanding the franchise rights of the utilities, as the building of a new project on the city streets is a proper exercise of police power to which the contractual rights of occupancy of the public streets by the utilities must yield.
On the other hand, the principal contentions of the utilities are that, whereas plaintiff has the right to require the removal or adjustment of their facilities, it may do so not under police power but only under authority of eminent domain; that their franchises accord them a property right to use the city streets; that these franchise rights may not be destroyed or impaired without payment of just compensation, which compensation is the cost of the adjustment and removal of the facilities; that, furthermore, plaintiff may not exert the police power of the State as it is merely a State agency not vested with police power and that, even if it is held that plaintiff has police power, the attempted use of such power in this case is unreasonable and arbitrary.
These contentions of the utilities were sustained in the district court, the Court of Appeal (see State v. Southwestern Electric Power Company, 127 So.2d 309) and by this Court on first hearing. On reconsideration, we are convinced that the defenses are contrary to the principles established by the settled jurisprudence of this Court and that the decision to be rendered herein is governed by the landmark case of New Orleans Gaslight Company v. Drainage Commission, 111 La. 838, 35 So. 929 (1903), affirmed 197 U.S. 453, 25 S.Ct. 471, 49 L.Ed. 831, as we shall later demonstrate.
Plaintiff's demand herein stems entirely from the obligation imposed on it by law and the authority specially conferred by the Legislature to construct and maintain the highways of this State in the interest of the public welfare and safety. As a necessary and integral concomitant of this authority, plaintiff invokes the police power of the State to require the utilities to remove their equipment from the construction site at their own expense.
The utilities do not deny that the State has such police power but they say that this power has not been delegated to plaintiff by the Legislature and that, since to require them to remove their equipment from the public way involves the impairment of their franchise property right to use the streets of the City of Shreveport, plaintiff can only force such removal under the power of eminent domain and that just compensation must be paid.
It is, of course, rudimentary that private property may not be taken or damaged for public purposes without payment of just compensation. This constitutional guarantee of compensation for the taking and damaging of private property for public purposes is in no way affected by the fact that the expropriator is exerting police power. Hence, if it be true, as the utilities claim, that plaintiff is taking or damaging *325 their property within the meaning of that term, as expressed in Section 2 of Article 1 of our Constitution, the question of whether plaintiff is properly exercising police power would be a matter of no importance as just compensation would nevertheless be due. Therefore, the primary question at the threshold of the case is whether or not the utilities' franchise right to use the streets of the City of Shreveport for the housing of their equipment is a property right of such a nature that it is not subject to reasonable exercise of the State's police power by requiring removal or adjustment of their lines and equipment without reimbursement of the costs expended for the forced change of location.
In our view, there has not been a taking or damaging of the contractual rights acquired by the utilities under their franchises with the City of Shreveport in any respect. Indeed, the contractual property right of the utilities to place their equipment on the city streets remains unimpaired. There has been no physical taking or damaging of the fixtures or other property of the utilities. The only demand of the plaintiff in this case is that the fixtures and equipment be removed from the public way in order that the controlled-access highway may be constructed and put in operation for the benefit of the public. True enough, the removal of the utilities' structures from the right-of-way will entail some expense but, when the case is viewed in its proper perspective, it will be seen that this expense was one which the utilities were required to bear by the obligations of the franchises granting them the use of the city streets.
The law is well settled, as pointed out in the New Orleans Gaslight Company case, supra, that a utility franchise to use the public streets of the city does not vest in the utility any right to occupy a particular part of the street; the right granted is "* * * ab initio not a perfect, but an imperfect, right, contingent and conditional in its nature and character, held subject to the paramount right of the state over the right, and controlled by law and regulation of the police authorities." This right to use the public streets does not vest the utilities with a servitude or any other sort of a real right in the streets. Indeed, under Article 458 of the Civil Code, the public streets belong in common to the inhabitants of the city and, therefore, private persons or corporations cannot acquire any proprietary interests therein.[2]
The utilities in this case are not claiming, except inferentially, that their franchise rights are being impaired by requiring them to move their equipment from the public way. If they were making such a claim, and if it could be said that there was an impairment of the franchise rights for which damages were due, then the measure of the recoverable damages would be the difference between the value of the franchises before and after the equipment was removed. See McMahon v. St. Louis, A. & T. R. Co., 41 La.Ann. 827, 6 So. 640; American Tel. & Tel. Co. of Louisiana v. Maguire, 219 La. 740, 54 So.2d 4; Texas Pipeline Company v. Barbe, 229 La. 191, 85 So.2d 260 and other cases holding that the only damages recoverable within the purview of Section 2 of Article 1 of our Constitution are severance damages, this being *326 the difference between the value of the property before and after the damages were inflicted. Mere consequential damages arising from discomfort, disturbance, injury to business, cost of removing property from the condemned premises and the like are damna absque injuria. Rapides Parish School Board v. Nassif, 232 La. 218, 94 So. 2d 40 and State through Department of Highways v. Levy, 242 La. 259, 136 So.2d 35.[3]
However, we do not find in this case that the requirement that the utilities remove their equipment from the construction site effects an impairment of the utilities' contractual rights. For, implicit in the franchises granted by the city to place lines, wires and poles on the streets was the condition that such equipment and facilities would not at any time interfere with any other public use to which the State or the City might see fit to devote the streets in the public interest. In dealing with franchise rights in the use of the public streets, 18 Am.Jur. "Eminent Domain" states the rule in Section 161 thus:
"Such a franchise is, however, granted upon an implied condition that the structures laid by virtue of its authority shall not at any time interefere with any other public use to which the state may see fit to devote the way, and consequently the corporation maintaining such structures is not entitled to compensation when the disturbance or removal of the structures or an alteration of their location is made necessary by a change in the grade of the highway, or the introduction therein of structures of some other character, or the devotion of the way to some other public use."
See also 23 Am.Jur. "Franchises", Sec. 24; 25 Am.Jur. "Highways", Sec. 182 and 52 Am.Jur. "Telegraphs and Telephones", Sec. 34.
The principle that a franchise to use the public streets for the housing of equipment is not an absolute right but, rather, is conditioned upon the superior right of the State to require removal of such equipment under a reasonable exercise of police power is, as we have indicated above, exactly the rationale upon which our decision in the New Orleans Gaslight Company case is based. And we have referred to that case as the landmark case for the reason that it has been repeatedly cited and quoted from with approval in the jurisprudence of this country since its affirmance by the Supreme Court of the United States in 1904. That case is identical with this one, the Gaslight Company having advanced the same contention as the utilities have raised here.
In that matter, the Gaslight Company, a corporation engaged in the business of selling gas for heating and lighting purposes in the City of New Orleans and having a franchise to lay its pipes in the city streets, instituted suit against the Drainage Commission of New Orleans, a State agency, to recover compensation for the costs involved in adjusting its transmission lines to accommodate the construction of drains by the defendant. The Gas Company contended, just as the utilities contend here, that it had a specific and special right "* * which it exercises under special and exclusive grant from the sovereign, which, being exercised by the grantee, reduced to possession, and in connection with the purpose for which it was granted by common consent and judicial and legislative authority, constitutes property protected by constitutional provisions, * * *". The Court rejected this argument and held the Company did not have any vested right to occupy any particular part of the public streets; that the right was an imperfect right held subject to the paramount right of the State to require the removal of the facilities and structures under the police power and that *327 this right, subject to this implied condition, could not be said to be damaged when the State, acting within the orbit of its police power, required such removal.
Counsel for the utilities say that the Gaslight Company case is inapplicable here for several reasons. First, they argue that the decision in that matter turned on the fact that the franchise was granted to the Gaslight Company long before the adoption of the Louisiana Constitution of 1879, which was the first constitution providing that compensation shall be paid for private property taken or damaged for public purposes, and that the result would have been different if the franchise had been granted after the Constitution had thus provided.
There is no merit in this proposition as the Court did not base its decision on the fact that the franchise had been granted prior to the adoption of the Constitution of 1879. It merely stated in the opinion that, had it not been for the inclusion of the guarantee of compensation for the taking of property for public purposes in the Constitution of 1879, "* * * we scarcely think that plaintiff would have raised the issue which it does now, or questioned the absolute right of the state to have required it to move its pipes, and to yield without claim to reimbursement to the public needs." Then the Court added: "The change made in the Constitution of 1879 did not alter the tenure by which plaintiff was to occupy the public streets. Plaintiff's original obligations in this respect remained as they had been undertaken at the beginning." (Italics ours).
The construction placed by the utilities on the observations of the Court in the Gaslight Company case results in an absurdity, for they would have the holding of the Court mean that the constitutional guarantee of compensation for private property taken or damaged for public purposes, when enacted, would only apply to future acquisitions of property and would not protect property rights existing prior to the time of the adoption of the Constitution.
Further, the utilities' counsel proclaim that the Gaslight case is not controlling because the plaintiff in this case is not invested with police power, it being professed that the State has not delegated this power to the Board of Highways and the State Department of Highways.
This postulation is untenable. A casual examination need only be made of Sections 19 and 19.1[4] of Article 6 of our Constitution (which makes it mandatory for the Legislature to provide for the establishment and maintenance of a system of hard-surfaced State highways and bridges and creates a Board of Highways vesting it with general control, management, supervision and direction of the Department of Highways with authority "* * * to establish, construct, extend, improve, maintain, and regulate the use of the State highways and bridges * * *") and Chapter 1 of Title 48 of the Revised Statutes, creating the Department of Highways conformably with the constitutional mandate, to render the conclusion inescapable that, in the establishment of this governmental agency which is given full control over the highway system of the State under the direction of the Board of Highways, the Legislature intended to delegate and did delegate all police power necessary for the fulfillment of the governmental purposes for which it was created.[5]
*328 We do not understand that the Legislature has to expressly employ the words "police power" in order to vest such power in a State administrative agency. If the duties assigned to that agency are such as would necessarily require the use of police power in the execution of its functions, it is but reasonable to conclude that police power has been delegated. See 11 Am.Jur. "Constitutional Law", Sec. 256 and New York City Tunnel Authority v. Consolidated Edison Co., 295 N.Y. 467, 68 N.E. 2d 445.[6] We have not the slightest doubt that the Legislature, by vesting in the State Department of Highways plenary control of the highway system of this State, intended to clothe that Department with every power which the Legislature was capable of delegating with respect to the purposes for which the Department was created. Indeed, the Legislature spelled out its intent as late as 1955, when it enacted a law providing for three classes of state highways (see Act 40 of 1955, R.S. 48:191-193). In Section 1 of that statute the Legislature, after setting forth that it was vitally essential to the general welfare of his State to build, maintain and operate a safe and efficient integrated system of highways and roads, and that inadequate roads and streets obstruct the free flow of traffic; "result in undue cost of motor vehicle operation; endanger the health and safety of the citizens of the state; depreciate property values, and impede generally economic and social progress * * *" stated that:
"In designating the highway systems of this state, as hereinafter provided, the Legislature places a high degree of trust in the hands of those officials whose duties it shall be, within the limits of available funds, to plan, develop, operate, maintain and protect the highway facilities of the state, for present as well as for future use.
"To this end, it is the intent of the Legislature to make the Board of Highways and the State Highway Department, acting through it, custodian of the state highway system and to provide sufficiently broad authority to enable the Board to function adequately and efficiently in all areas of appropriate jurisdiction, * * *". (Italics ours).
The next contention of counsel for the utilities is that the New Orleans Gaslight case is distinguishable because the police power exerted by plaintiff in this matter is unreasonable. This argument is based on the premise that the project under construction is a vast undertaking, which encompasses the destruction of the city streets and the building of a freeway with cloverleaves, interchanges and the like, totally unlike the mere change in width and grade of a roadway which would require only that the utilities move their facilities from one portion of the street to another. The inference we draw from the contention is that counsel conceives that the enormity of the project is beyond the scope of the implied condition of the franchises which contemplated no more than normal changes of the streets by the city authorities for the accommodation of traffic.
This objection, like the others above noted, is not well founded. The answer is that the Highway Department is specifically authorized by law to construct this important project and it is only necessary to consider *329 the legislative intent so strongly expressed in Section 1 of Act 40 of 1955, from which we have quoted hereinabove, to make it manifest that the contention of the utilities, which really relates to the degree of the improvement, is without substance. To say that these public improvements, which are being fostered by the State in the interest of public safety and the general welfare, are unreasonable, is unrealistic. The highway project is an answer to a growing public need and the very reason for the implied condition in the franchises is in contemplation of changing public requirements. See City of Shreveport v. Kansas City, S. & G. Ry. Co. 167 La. 771, 120 So. 290, 62 A.L.R. 1512.
Another argument of counsel is that plaintiff is discriminating against the utilities because it agreed to reimburse the City of Shreveport for the removal of water mains and other equipment which the City had placed on the streets.
Suffice it to say that this is not a legal argument. Whatever plaintiff agreed to do with regard to the City of Shreveport is no concern of the defendant utilities and cannot be employed by them as a ground for evading their obligation to remove their facilities from the public way.
Finally, counsel, citing the Federal Highway Act of 1956 (23 U.S.C. Sec. 123), assert that, since Congress recognized therein that relocation of utility facilities was a necessary part of highway construction in the interstate highway system and specifically authorized the use of Federal funds to reimburse states for the Government's proportion of the amounts paid to the utilities for costs of relocation of their facilities, it has evidenced its intent that such relocation costs are unprecedented and should not be required to be borne by the utilities. From this predicate, it is argued that it is improper to hold that the costs of removal should not be paid by plaintiff forasmuch as the law of Louisiana does not prohibit reimbursement and since a proportionate part (90% in this instance) of all monies plaintiff would be required to pay could be recovered from the Federal Government.
We find no substance in this contention. Liability of plaintiff for the costs of removal of the utilities' facilities from the public way is not to be determined on its right under the Federal statute to obtain reimbursement of a large proportion of the costs from the United States. On the contrary, such liability is to be resolved by the laws of this State. The fact that our law may not prohibit reimbursement of the utilities has nothing to do with the plaintiffs' liability for reimbursement. We hold that no such liability legally exists.
For the reasons assigned, the judgment of the district court, which was affirmed by the Court of Appeal, is reversed and it is now ordered that there be judgment herein in favor of the Department of Highways of the State of Louisiana declaring that the costs of removal, adjustment and relocation of the public utility lines and equipment owned by the defendant, Southwestern Electric Power Company, and the lines and equipment of the intervenor, Shreveport Transit Company, Inc. in the former streets of the City of Shreveport, be borne by the owners thereof and that the State of Louisiana, through the Department of Highways, is not liable for any expenses attendant thereto. All costs of these proceedings are to be paid by defendant and intervenor.
HAMITER, J., dissents, being of the opinion that our original decree was correct and should be reinstated.
SUMMERS, J., dissents and assigns reasons.
HAMITER and SUMMERS, JJ., dissent from refusal of a second rehearing.
SUMMERS, Justice (dissenting from the opinion on rehearing).
Since the rehearing presented no matter not thoroughly considered originally, there is no cause to abandon my original views.
*330 It is to be noted that the majority, to support its position and in rejecting the reasons originally assigned, has relied heavily upon the case of New Orleans Gaslight Company v. Drainage Commission, 111 La. 838, 35 So. 929 (1903), affirmed 197 U.S. 453, 25 S.Ct. 471, 49 L.Ed. 831. That case, as viewed by the United States Supreme Court, stood for one proposition: "* * * uncompensated obedience to a regulation enacted for the public safety under the police power of the state was not taking property without due compensation." (Emphasis added.) It was observed then (197 U.S. 453, 462, 25 S.Ct. 471) that the relocation of the pipes of the Gaslight Company did not constitute a taking of its property and the injury (expense) sustained in the relocation was damnum absque injuria.
The significant difference between the Gaslight Company case and the case at bar is that in the former the exercise of the police power was considered proper inasmuch as it was invoked to regulate the use of the Gaslight Company's property. What was required by that regulation was a "shifting" of the mains and pipes of the Gaslight Company "to another part of the street" under an implied obligation of the company in its franchise to do just that. The difference, then, between that case and the case at bar is obvious.
In the case at bar, involving only one segment of the highway project, what is being required is a destruction of the existing installation of the utilities. These installations are being entirely displaced from the area involved. To continue their obligations to furnish service under their franchises, the utilities will have to find new rights-of-way for the location of their facilities, and where these facilities, lines and poles, are to cross the highway, it will be necessary that they be redesigned at considerable additional expense to meet more burdensome requirements imposed by the highway project. It is to be kept in mind, too, that what is involved here is only one segment of this highway project within the city of Shreveportthere will undoubtedly be other displacements of these utilities within the city in connection with the same project. Unlike the Gaslight Company case, there can be no implication that the franchise contemplated an obligation on the part of the utilities to abandon their use of substantial portions of the streets and alleys altogether. The city's refusal to call upon them for the removal makes this quite clear. To conclude otherwise would make the franchise meaningless.
Police power, whatever it is, cannot prevail over safeguards contained in our State and Federal Constitutions. These safeguards are contained in the fifth amendment of the Federal Constitution and in the Louisiana constitution where it is declared at the very outset (Art. I, Sec. 2) that "* * * private property shall not be * * * damaged except for public purposes and after just and adequate compensation is paid." (Emphasis added.) If it were intended that this provision was to be subordinate to police power, provision would and should have been made to that effect like the suspension of habeas corpus in times of war or insurrection. This was not done and the reason is plain. This constitutional provision, like due process of law, is a restraint upon the exercise of governmental authority, including police powers. In my view the facts at bar exemplify the very situation Article I, Section 2 of the Constitution was intended to safeguard against.
Furthermore, what reasons could exist for holding that the police power can be invoked here to surmount the constitution of this State. The only justification advanced is that such a recourse will result in monetary savings to the Highway Department. This is meagre cause to disregard such a fundamental constitutional safeguard.
Justice Holmes expressed the principle which is applicable to this case as follows:
"The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but *331 provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. * * When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States. * * We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S. Ct. 158, 67 L.Ed. 322.
The majority, though made aware of the danger referred to above, has nevertheless disregarded plain, explicit constitutional safeguards in order to reach its decision.
I respectfully dissent.
NOTES
[1] 23 U.S.C.A. § 123(a) provides: "123. Relocation of utility facilities. (a) When a State shall pay for the cost of relocation of utility facilities necessitated by the construction of a project on the Federal-aid primary or secondary systems or on the Interstate System, including extensions thereof within urban areas, Federal funds may be used to reimburse the State for such cost in the same proportion as Federal funds are expended on the project. Federal funds shall not be used to reimburse the State under this section when the payment to the utility violates the law of the State or violates a legal contract between the utility and the State. Such reimbursement shall be made only after evidence satisfactory to the Secretary shall have been presented to him substantiating the fact that the State has paid such cost from its own funds with respect to Federal-aid highway projects for which Federal funds are obligated subsequent to April 16, 1958, for work, including relocation of utility facilities."
[2] LSA-R.S. 48:218; LSA-R.S. 48:441 et seq.; LSA-R.S. 19:1 et seq., etc.
[3] State ex rel. Hutton v. City of Baton Rouge, 217 La. 857, 47 So.2d 665; Shreveport Traction Company v. City of Shreveport, 122 La. 1, 47 So. 40; East Louisiana Railroad Company v. City of New Orleans, 46 La.Ann. 526, 15 So. 157; City of New Orleans v. Great Southern Telephone and Telegraph Co., 40 La.Ann. 41, 3 So. 533; Arkansas Louisiana Gas Company v. Louisiana Department of Highways, La.App., 104 So.2d 204; 37 C.J.S. Franchises §§ 2, 8; City of Seattle v. Columbia, & P. S. R. Co., 6 Wash. 379, 33 P. 1048; Arkansas State Highway Commission v. Arkansas Power and Light Company, 231 Ark. 307, 330 S.W. 2d 77.
[4] La.Const. Arts. I, Sec. 2, and IV, Sec. 15, L.S.A.
[5] 18 La.Law Rev. 509.
[*] Renumbered 19.2.
[1] Indeed, the position of the utilities is no different from that of an individual or corporation who is given the privilege (either gratuitously or for a consideration), to place, store, and maintain personal property on the real property of another. To illustrateif A, the owner of real estate, allows or contracts with B to permit the latter to store furniture or other property in A's house and, subsequently, A's real estate is expropriated by C, a governmental agency, for public use could B recover from C the cost of removing his goods from the condemned premises on the theory that a property right had been invaded by the condemning authority? Of course not. Yet, that is exactly the end result of the contention of the utilities in the instant case.
[2] However, I feel impelled to say that the majority conclusion that police power has not been delegated to the Department of Highways by the Legislature is incorrect and unrealistic. Examination need only be made of Sections 19 and 19.1 of Article 6 of our Constitution (which makes it mandatory for the Legislature to provide for the establishment and maintenance of a system of hard-surfaced state highways and bridges and creates a Board of Highways vesting it with general control, management, supervision and direction of the Department of Highways) and Chapter 1 of Title 48 of the Revised Statutes, which creates the Department of Highways conformably with the constitutional mandate, to make it perfectly evident that in the establishment of this governmental agency, which is given full control over the highway system of the State, the Legislature intended to and did delegate to this department all police power necessary for the fulfillment of the governmental purposes for which it was created. Specifically, R.S. 48:21 states, inter alia, that the functions of the Department shall be to administer, construct, improve, maintain, repair and regulate the use of the state highway system and, in R.S. 48:26, under the caption "Incidental Powers", it is provided that "* * * the department may perform every act necessary, convenient, or incidental to the exercise of its power and authority, the discharge of its duties, or the performance of its functions."

Thus, the Highway Department is a special state agency, invested by the sovereign with full control over its highway system and to say that it has not been granted all police power necessary to insure the performance of its duties and functions strikes me as patently fallacious.
[1] Originally, Southwestern Electric Power Company was the only defendant; later, Shreveport Transit Company, Inc. intervened in the case on the side of the defendant.
[2] The rationale of the cases from Arkansas and New York, which have held that franchise holders are entitled to recover, under circumstances similar to those presented here, the cost of removing their property and equipment from the public way, even though there is no special statutory authority requiring such reimbursement (see Arkansas State Highway Commission v. Arkansas P. & L. Co., 231 Ark. 307, 330 S.W.2d 77 (1959) and similar case bearing same title which was decided on June 4, 1962 and In re Gillen Place, Borough of Brooklyn, etc., 304 N.Y. 215, 106 N.E.2d 897), is that the utility franchises invested them with easements on the public streets. These pronouncements are of no persuasive effect in Louisiana in view of our codal law of servitudes which, as pointed out above, does not permit the establishment of a servitude on public property in favor of private interests.
[3] Here, the utilities do not claim that the value of their franchise rights have been impaired because they have been required to adjust and remove their facilities; they seek merely consequential damages for the costs of removal which are not recoverable under the authorities above cited.
[4] The Secretary of State, in printing the Constitution under the authority of Act 380 of 1954, has designated Section 19.1 above referred to (which was adopted on November 4, 1952) as Section 19.2 to distinguish it from the previous Section 19.1 which was adopted in 1948. The numbering of the second Amendment as Section 19.1 was obviously a clerical error. See State, through Department of Highways v. Bradford, 242 La. 1095, 141 So.2d 378 decided, on rehearing, April 30, 1962.
[5] Specifically, R.S. 48:21 provides, inter alia, that the function of the Department shall be to administer, construct, improve, maintain, repair and regulate the use of the State Highway system. R.S. 48:26, under the caption "Incidental Powers", declares that "* * * the department may perform every act necessary, convenient, or incidental to the exercise of its power and authority, the discharge of its duties, or the performance of its functions."
[6] In the cited case, the New York Court of Appeals stated, on page 449 of 68 N.E. 2d: "The enabling act, it is true, does not contain any delegation of police power in haec verba, but such language is at best rare; it is not contained in any of the statutes * * * to which our attention has been called. The legislation does, however, contain the languageto which we have already referredclothing this authority with the attributes of delegated sovereignty as a State agency."